94 P.3d 1275

STATE of Hawai'i, Plaintiff–Appellant,

v.

Terrence D. WALLACE, Defendant–
Appellee.

No. 25894.

Supreme Court of Hawai'i.

July 22, 2004.

Simone C. Polak, Deputy Prosecuting Attorney, on the briefs, for plaintiff-appellant.

Joyce K. Matsumori–Hoshijo, Deputy Public Defender, on the briefs, for defendant-appellee.

MOON, C.J., LEVINSON, NAKAYAMA, and DUFFY, JJ.; ACOBA, J., concurring separately.

Opinion of the Court by MOON, C.J.

Plaintiff-appellant State of Hawai'i [hereinafter, the prosecution] appeals from the June 12, 2003 findings of fact (FOF), conclusions of law (COL) and order of the Circuit Court of the Second Circuit, the Honorable Shackley F. Raffetto presiding, granting defendant-appellee Terrence D. Wallace's motion to suppress statements. On appeal, the prosecution essentially contends that: (1) inasmuch as Wallace was not in custody, *Miranda* warnings, although given, were not required and statements made by Wallace were not obtained in violation of the privilege against self-incrimination or the right to counsel; and (2) even assuming that Wallace was in custody, Wallace knowingly, intelligently, and voluntarily waived his *Miranda* rights, notwithstanding his refusal to execute a written waiver of rights. The prosecution argues, therefore, that the circuit court erred in granting Wallace's motion to suppress. For reasons discussed more fully *infra*, Section III, we find merit in the prosecution's contentions and vacate the circuit court's June 12, 2003 FOF, COL and order and remand for proceedings consistent with this opinion.

## I. BACKGROUND

On April 9, 2003, at approximately 6:01 p.m., Maui Police Department (MPD) Officer

Leif Adachi and MPD Officer Greg Rowe received an assignment to look for "a possible reckless driver, DUI driver, driving a gray Nissan pickup truck in Wailuku[,]," with license plate number 4RTUTU. Suspecting that the vehicle was stolen "and due to past cases of stolen vehicles," Officers Adachi and Rowe "checked the address of 1718 Lehua Street."

Officers Adachi and Rowe parked their police vehicle on a private driveway running to the back of 1718 Lehua Street. Upon exiting their vehicle, the officers saw Wallace "coming from the back of the [1718 Lehua Street] residence walking toward the police car."

According to Officer Adachi, Wallace saw him and Officer Rowe and "looked like he was going to turn around because he turned his shoulders. And at that point I think he recognized my partner[, Officer Rowe]. They grew up together." Wallace then walked up to Officer Rowe, who asked Wallace what he was doing. Officer Adachi testified that Wallace replied that he was going to his uncle's house. "And at that point we said okay, and he left." According to Officer Adachi, he did not suspect Wallace of anything at that point.

After Wallace left, Officers Adachi and Rowe continued to look for the suspect vehicle, which they eventually located in an empty lot next to 1718 Lehua Street. Officer Adachi testified that "[t]he rear driver's side window [of the suspect vehicle] was shattered, and . . . we found that the plates were fraudulent[ ]. . . ." Officer Adachi confirmed with dispatch that the vehicle was stolen.

Soon thereafter,[1] Wallace returned to the area and walked up to the officers. According to Officer Adachi, "[Wallace] asked what was going on, what we were doing, what's up with the truck." When asked if Wallace was a suspect at that point, Officer Adachi responded in the negative.

According to Officer Adachi, Wallace then walked around the vehicle, looked inside, and indicated that he wanted the cigarettes out of the vehicle, although he did not claim ownership of them. At that point, Officer Adachi considered Wallace to be a "person of infor-

mation" with respect to the vehicle and asked him what he knew about it. Wallace "related he was there when the truck pulled up. This guy named—he knew as Jeff, called him haole Jeff was driving. Jeff parked the truck and then ran away." Officer Adachi observed that Wallace "appeared nervous, little bit jittery. He wasn't looking at us. He talked down or talked to the side, wasn't looking at our faces, kept playing with his clothes, his pants. And . . . it looked like he knew more than what he was telling us."

Officer Adachi testified that he did not feel that he had probable cause to make an arrest yet and that Wallace was free to leave if he wanted. When asked whether Wallace was "crowded or restrained by officers while he [(Wallace)] was giving . . . his brief report[,]" Officer Adachi replied in the negative, adding "I actually just told him to stand on the side, and we kept doing what we had to do with the vehicle." However, in view of Wallace's nervousness, lack of eye contact, and fidgeting, Officer Adachi made a decision at that point to read Wallace his *Miranda* rights, using MPD Form 103 (Form 103). The prosecution elicited the following testimony from Officer Adachi regarding Officer Adachi's use of Form 103 in advising Wallace of his constitutional rights:

A. [ (By Officer Adachi) ] I had him fill out his name at the top with his print or typed name of the person warned. I read each line to him out loud. Explained it to him each right. I had him initial the rights. After the right to make—indicate that he understood it. And then I had him sign that he was—understood his rights.

Q. [ (By prosecutor) ] Okay. Did he express any difficulty understanding the reading of his rights.

A. No.

Q. Did he appear to you to be coherent?

A. Yes. Sir.

Q. Did he have any problems speaking at that point?

A. No.

---

1. Officer Adachi testified that about five minutes had passed since Wallace had initially departed the scene.

Q. And he did sign the understanding of rights [section of Form 103]; is that correct?

A. Yes, sir.

Q. When it came—well, first of all, let me ask you, did he—after informing him of his rights and having him initial those rights and signing that he understood those rights, were you able to determine whether or not he was willing to waive his right to remain silent and speak with you?

A. Yes.

Q. Was he willing to do that?

A. Yes, sir.

Q. And upon his willingness to speak with you and waive his rights to remain silent, did you inquire whether he was willing to sign the waiver of rights portion?

A. Yes, sir.

Q. Was he willing—did he want to sign the portion?

A. *At that point, no, he refused to sign. He said he'd still talk to us, but he wasn't signing it.*

Q. *Did he make any statement why he wasn't going to sign it?*

A. *He just refused. He didn't want to.*

Q *Now, his refusal to sign, though, did that affect his willingness to speak with you?*

A. *No.*

Q. *And he still continued to speak with you?*

A. *Yes.*

Q. *Okay. Even at that point, though, had you determined whether you had enough probable cause to make an arrest at that point?*

A. *No.*

Q. And when you did continue speaking with the defendant, what was the gist of the information he provided?

A. The fact that we had a description of the driver. He fit the description, basic description anyway.[2] His actions there

at the scene, and suspicious nature that he kept coming towards us and asking about the truck and whatnot. He appeared he had a personal interest in the vehicle.

Q. All right. I think I may have not made my question clear.

*What statement did he give you after he waived his rights?*

A. *Oh, he eventually admitted that he was driving the vehicle, and that Jeff was with him in the vehicle.*

Q. Okay. And after that basic admission of driving the vehicle, at that point, what did you do?

A. Informed him that he was being placed under arrest and take him into custody.

Q. Okay. And did you inform him that he was being placed under arrest for unauthorized control of a propelled vehicle?

A. Yes, sir.

(Emphases added.) Upon being transported to the Wailuku police station, Wallace indicated in a written statement that he had seen Jeff in the vehicle at 1718 Lehua Place around 6:00 p.m. and observed Jeff flee the scene.

On April 12, 2002, a Maui grand jury charged Wallace with one count of unauthorized control of a propelled vehicle, in violation of Hawai'i Revised Statutes (HRS) § 708–836 (1993 and Supp.1999).[3] On April 15, 2003, Wallace filed his motion to suppress, arguing that his statements were obtained in violation of his constitutional rights. Specifically, Wallace argued that he neither knowingly, intelligently, nor voluntarily waived the privilege against self-incrimination or the right to counsel, pointing to his refusal to execute the waiver of rights portion on Form 103.

At the suppression hearing on April 24, 2003, Officer Adachi was the only witness to

**2.** Officer Adachi testified that the initial description of the driver of the vehicle was "just a male wearing a baseball cap." Officer Adachi confirmed that Wallace was wearing a baseball cap.

**3.** HRS § 708–836 provides in relevant part:
**Unauthorized control of propelled vehicle.** (1) A person commits the offense of unauthorized control of a propelled vehicle if the per-

son intentionally or knowingly exerts unauthorized control over another's propelled vehicle by operating the vehicle without the owner's consent or by changing the identity of the vehicle without the owner's consent.

(2) "Propelled vehicle" means an automobile, airplane, motorcycle, motorboat, or other motor-propelled vehicle.

testify. On May 13, 2003, the circuit court orally granted Wallace's motion to suppress, stating in relevant part:

> After careful consideration of the record as a whole, the evidence produced at the hearing, the Court rules as follows.
>
> The evidence shows that the defendant was administered the Miranda rights as a prelude to questioning by the police, and the [MPD] Form 103 was utilized for this purpose.
>
> During the process of giving defendant his rights, he said he refused to sign the waiver of right[s] portion of the form which provides, among other things, that he's willing to make a statement and answer questions without talking to a lawyer or having a lawyer present. His refusal was acknowledged by Officer Adachi who entered the word, refused, quote unquote, on the waiver portion of Form 103.
>
> *Officer Adachi testified that the defendant, nonetheless, at the same time, stated that he desired to talk with the police.* The burden is on the State to prove by a preponderance of the evidence that the defendant's waiver of his rights was voluntarily, knowingly and intelligently given.
>
> *Taking into consideration the holding of the Hawaii Supreme Court in the case of State versus [v.] Hoey, H-O-E-Y, 77 Hawai'i, 17 [881 P.2d 504], 1994 case, this Court finds the statement of the defendant regarding his desire to waive his rights and talk to the police was ambiguous, and under the totality of the circumstances of this case, the police had a duty to clarify whether the defendant knowingly and intelligently waived his constitutional rights.*
>
> The police failed to clarify the ambiguity, therefore the Court can not find that the defendant voluntarily, knowingly and intelligently waived his rights and the defendant's motion to suppress is granted and the statements are suppressed. But that does not reply [sic] to his remarks prior to the giving of the rights.
>
> . . . .

(Emphases added.)

The circuit court's June 12, 2003 FOF, COL and order includes the following relevant FOFs:

18. The vehicle was ... located [by Officers Adachi and Rowe] to the rear of the residence of 1718 Lehua Street, exactly where Defendant had initially approached the officers from.

19. There was no one else in the vicinity [sic] of the vehicle.

20. The vehicle plates were found to be fraudulent and officers confirmed the vehicle was stolen.

21. After about five minutes Defendant approached the officers a second time.

22. Defendant asked what was going on, what officers were doing with the truck, and what was up with the truck.

23. Defendant walked around the truck.

24. After noticing there were cigarettes in the truck, Defendant asked the officers if he could have the cigarettes to smoke.

25. Officers thought Defendant's actions were suspicious.

26. *Officers then asked Defendant what he knew about the truck.*

27. *Defendant related he was there when the truck pulled up and a guy Defendant called "haole Jeff" parked the truck and ran away.*

28. *During this conversation with police, Defendant appeared nervous and jittery, he would not make eye contact, and he kept playing with his clothes.*

29. *Based on the fact that Defendant matched the description of the driver coupled with his unusual behavior, Officer Adachi came to the conclusion that Defendant knew more than what he was telling police.*

30. *At this point, Officer Adachi informed Defendant of his Miranda rights utilizing M.P.D. form 103.*

31. Officer Adachi, using M.P.D. form 103, read each line to Defendant, out loud, explained each right, and had Defendant initial next to each right, indicating Defendant understood the right.

32. Officer Adachi then had Defendant sign his name on the form indicating Defendant understood his rights.

33. *Defendant then refused to sign the waiver of rights portion of M.P.D. form 103.*

34. The waiver of rights portion of M.P.D. form 103 states, "I am willing to make a statement and answer questions without talking to a lawyer or having a lawyer present. No promises or threats have been made to me and no pressure or force of any kind has been used against me. I understand that I still have the right to stop answering questions or to ask for a lawyer at anytime."

35. Under this statement of waiver, there is a signature line.

36. Officer Adachi wrote "refused" on the signature line for the waiver of rights portion when Defendant refused to sign it.

37. *Defendant stated he was willing to talk to police but he was not signing the form.*

38. *Officer Adachi did not clarify with Defendant whether or not his refusal to sign meant that he did want to consult with a lawyer.*

39. *Instead, Officer Adachi continued to question Defendant about the car.*

40. *As a result of Officer Adachi's questioning, Defendant admitted to driving the stolen vehicle.*

41. Because of Defendant's admission, Defendant was placed under arrest for unauthorized control of a propelled vehicle and transported to the Wailuku Police station.

. . . .

(Emphases added.)

The following relevant COLs are also set forth in the circuit court's June 12, 2003 FOF, COL and order:

4. When Defendant first approached Officer Rowe, Defendant was not in custody.

5. When Defendant approached the officers the second time, while they were investigating the truck, Defendant was not in custody for purposes of Miranda warnings.

6. When Officer Adachi first began questioning Defendant about his knowledge of the vehicle, the questioning was for purposes of investigation and Defendant was not in custody.

7. *When Officer Adachi developed the conclusion that Defendant knew more about the vehicle than what he was saying, the questioning ceased to be brief and casual and became sustained and coercive, requiring Miranda warnings.*

8. *The State has the burden to show that Defendant made a knowing, intelligent, and voluntary waiver of his right to remain silent.* State v. Amorin, 61 Haw. 356, 604 P.2d 46 [45] (1979); State v. Pahio, 58 Haw. 323, 569 [568] P.2d 1200 (1977); Miranda v. Arizona, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966).

9. *The State has the burden to show that Defendant made a knowing, intelligent, and voluntary waiver of his right to consult with an attorney.* State v. Amorin, 61 Haw. 356, 604 P.2d 45 (1979); State v. Pahio, 58 Haw. 323, 568 P.2d 1200 (1977); Miranda v. Arizona, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966).

10. When a suspect makes an ambiguous request for counsel during custodial interrogation, police have a duty to either cease all questioning or seek non-substantive clarification of the suspect's request. State v. Hoey, 77 Hawai'i 17, 881 P.2d 504 (1994).

11. *Based on State v. Hoey, this court finds that Defendant's refusal to sign the waiver of rights section of M.P.D. form 103, while agreeing to talk with police at the same time, was ambiguous and equivocal.*

12. *All questioning of Defendant should have ceased at the point Defendant refused to sign the form.*

13. *Officer Adachi failed to clarify the ambiguity.*

14. *Officer Adachi should have clarified with Defendant whether or not his refusal to sign the form meant that he did want to consult with an attorney.*

15. Defendant's incriminating statements obtained after Officer Adachi's failure to clarify the ambiguity, were obtained in violation of Defendant's constitutional rights under Article I, Sections 5 and 10 of the Hawaii State Constitution, as well as

the 5th and 14th Amendments to the United States Constitution.

(Emphases added.)

This timely appeal followed.

## II. STANDARD OF REVIEW

■ "We answer questions of constitutional law by exercising our own independent judgment based on the facts of the case. . . . Thus, we review questions of constitutional law under the 'right/wrong' standard." *State v. Jenkins,* 93 Hawai'i 87, 100, 997 P.2d 13, 26 (2000) (citations, some quotation signals, and some ellipsis points omitted). Accordingly, "[w]e review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was 'right' or 'wrong.' " *Id.* (citations and some quotation signals omitted).

*State v. Locquiao,* 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002) (quoting *State v. Poaipuni,* 98 Hawai'i 387, 392, 49 P.3d 353, 358 (2002)).

## III. DISCUSSION

A. *Whether Wallace was in Custody*

■ "It is a fundamental tenet of criminal law that 'the prosecution may not use *statements,* whether exculpatory or inculpatory, *stemming from custodial interrogation* of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.' " [4] *State v. Naititi,* 104 Hawai'i 224, 235, 87 P.3d 893, 904 (2004) (quoting *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)) (emphases in original).

The "*Miranda* rule[ ]" . . . is, at core, a constitutionally prescribed rule of evidence that requires the prosecution to lay a sufficient foundation—i.e., that the requisite warnings were administered and validly waived before the accused gave the statement sought to be adduced at trial—before it may adduce evidence of a defendant's custodial statements that stem from interrogation during his or her criminal trial. . . .

*The prosecution's burden of establishing that the requisite warnings were given, however, is not triggered unless the totality of the circumstances reflect that the statement it seeks to adduce at trial was obtained as a result of "custodial interrogation," which, as the United States Supreme Court defined it in Miranda, consists of "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his [or her] freedom of action in any significant way."* 384 U.S. at 444, 86 S.Ct. 1602 (footnote omitted); *see also [State v.] Hoey,* 77 Hawai'i [17,] 33, 881 P.2d [504,] 520 [ (1994) ] ("the privilege [against self-incrimination] is jeopardized when an individual is taken into custody or otherwise deprived of his [or her] freedom by the authorities in any significant way and subjected to questioning") (citations, original ellipsis points, and internal quotations signals omitted); *State v. Melemai,* 64 Haw. 479, 481, 643 P.2d 541, 543 (1982); *State v. Patterson,* 59 Haw. 357, 359, 581 P.2d 752, 754 (1978). *In other words, the defendant, objecting to the admissibility of his or her statement and, thus, seeking to suppress it, must establish that his or her statement was the result of (1) "interrogation" that occurred while he or she was (2) "in custody."* See, e.g., *[State v.] Ah Loo,* 94 Hawai'i [207,] 210, 10 P.3d [728,] 731 [ (2000) ] ("the requirement of *Miranda* warnings is triggered by 'two criteria': '(1) the defendant must be under interrogation; and (2) the defendant must be in custody' " (quoting *State v. Kauhi,* 86 Hawai'i 195, 204, 948 P.2d 1036, 1045 (1997) (quoting *State v. Blanding,* 69 Haw. 583, 586, 752 P.2d 99, 100 (1988))) (original brackets omitted)).

*State v. Ketchum,* 97 Hawai'i 107, 117–18, 34 P.3d 1006, 1016–18 (2001) (emphases and some brackets added) (footnotes omitted).

■ As previously indicated, the circuit court found, and the prosecution does not dispute, that Wallace was not in custody the

---

**4.** A suspect must be advised "of his right to remain silent, that anything he says can and will be used against him, that he has the right to have his attorney present, and that if he cannot afford counsel, one will be appointed for him prior to any interrogation." *State v. Kalai,* 56 Haw. 366, 368, 537 P.2d 8, 11 (1975) (construing *Miranda,* 384 U.S. at 467–74, 86 S.Ct. 1602).

first time he approached Officers Adachi and Rowe. Additionally, with respect to the second time Wallace approached Officers Adachi and Rowe, the prosecution does not dispute that Wallace was subject to interrogation. Our inquiry, therefore, focuses strictly on whether Wallace was in custody during his second encounter with Officers Adachi and Rowe for purposes of triggering the protections afforded by *Miranda.*

> "*To determine whether 'interrogation' is 'custodial,' we look to the totality of the circumstances, focusing on 'the place and time of the interrogation, the length of the interrogation, the nature of the questions asked, the conduct of the police, and [any] other relevant circumstances.'*" *Ah Loo,* 94 Hawai'i at 210, 10 P.3d at 731 (quoting *Melemai,* 64 Haw. at 481, 643 P.2d at 544) (brackets in original). Again, the question to be answered, once it is determined that a defendant has been "interrogated" within the meaning of article I, section 10, is whether the defendant, at the time of the "interrogation," was "in[ ] custody or otherwise deprived of his [or her] freedom ... in any significant way[.]" *Hoey,* 77 Hawai'i at 33, 881 P.2d at 520 (citations omitted).

*Ketchum,* 97 Hawai'i at 122, 34 P.3d at 1021 (emphasis added)(footnote omitted).

"[N]o precise line can be drawn" delineating when "custodial interrogation," as opposed to non-custodial "on-the-scene" questioning (which is outside the protection against self-incrimination that article I, section 10 affords to an accused), has occurred. *Ah Loo,* 94 Hawai'i at 210, 10 P.3d at 731 (citations, internal quotation signals, and original brackets omitted). "Rather, the question whether a person has been significantly deprived of his or her freedom, such that he or she is 'in custody' at the time he or she is 'interrogated,' must be addressed on a case-by-case basis 'because each case must necessarily turn upon its own facts and circumstances.' " *Ketchum,* 97 Hawai'i at 123, 34 P.3d at 1022 (quoting *Patterson,* 59 Haw. at 362, 581 P.2d at 756).

 However, as explained by the *Ketchum* court:

> Nonetheless, we discern a point along the spectrum "beyond which on-the-scene [questioning]" becomes "custodial," such

that article I, section 10 precludes the prosecution from adducing a defendant's resulting statement at trial unless the question has been preceded by the requisite *Miranda* warnings. *Ah Loo,* 94 Hawai'i at 210, 10 P.3d at 731; *Patterson,* 59 Haw. at 362, 581 P.2d at 755–56. On one side of that point is the situation in which a person subjected to lawful investigative detention, which is brief in duration and during which the officer poses questions that are designed to confirm or dispel the officer's reasonable suspicion that criminal activity is afoot, has not had his or her liberty infringed to such a significant degree as to render the detainee "in custody" for purposes of triggering the prosecution's burden—under article I, section 10 of the Hawai'i Constitution—of establishing that the requisite *Miranda* warnings were first properly administered as an evidentiary precondition to the admissibility of the detainee's responses to the officer's questions at trial. *See Ah Loo,* 94 Hawai'i at 212, 10 P.3d at 733; *State v. Hoffman,* 73 Haw. 41, 54, 828 P.2d 805, 813 (1992); *Patterson,* 59 Haw. at 362–63, 581 P.2d at 755–56.

. . . .

> . . . . *In essence, . . . Ah Loo reiterates the basic principle that when an officer lawfully conducting an investigative detention lacks probable cause to arrest the detainee and—so long as his or her questions remain brief and casual and do not become sustained and coercive—has not impliedly accused the detainee of committing a crime, the officer has not significantly infringed upon the detainee's liberty, such that the detainee is "in custody" and has thus. been transformed into an "accused" to whom the protection against self-incrimination attaches.*

> But, under *Ah Loo,* once a detainee becomes expressly or impliedly accused of having committed a crime—*because the totality of the circumstances reflects either that probable cause to arrest the detainee has developed or that the officer's questions have "become sustained and coercive," the officer's investigation having focused upon the detainee and the questions no longer being designed to dispel or con-*

firm the officer's reasonable suspicion—, then *Miranda* warnings, as well as a valid waiver [of] the detainee's related constitutional rights, are required before the fruit of further questioning can be introduced in a subsequent criminal proceeding against the detainee. *Id.* at 212, 10 P.3d at 733.

*Id.* at 123–24, 34 P.3d at 1022–23 (emphases added).

■ Discussing "the other side of the 'point along the spectrum,' " the *Ketchum* court stated:

Accordingly, on the other side of the "point along the spectrum" stands the proposition, equally axiomatic, that a person whom an officer has formally and "physically" arrested is "in custody" for purposes of article I, section 10. . . . As this court acknowledged in *[State v.] Wyatt,* "[i]t is well settled that the safeguards prescribed by *Miranda* become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " 67 Haw. [293,] 301 n. 6, 687 P.2d [544,] 550 n. 6 [ (1984) ] (quoting *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curiam))). Simply said, even without sustained and coercive questioning, if the "point of arrest . . . has been reached," the prosecution must establish that *Miranda* warnings, as well as a valid waiver of the defendant's related constitutional rights, preceded any "interrogation" as a precondition to the admissibility at trial of any resulting statement made by the defendant. *See Ah Loo,* 94 Hawai'i at 210, 10 P.3d at 731 (citations omitted).

However, determining the precise point at which a temporary investigative detention has ripened into a warrantless arrest is no more susceptible to a bright-line rule than is determining when a suspect is "in custody." . . . *Nevertheless, it is self-evident that a temporary investigative detention in the absence of sustained and coercive questioning is "noncustodial," whereas an arrest is "custodial." See Ah Loo, 94 Hawai'i at 210, 10 P.3d at 731. Accordingly, an arrestee is obviously "in custody" whether or not, in retrospect, the arresting officer had probable cause to ef-*fect the arrest in the first place. . . . So long as an objective assessment of the totality of the circumstances reflects that "the point of arrest" has arrived, the arrestee, at that point, is "in custody" for purposes of article I, section 10.*

Although there is no simple or precise bright line delineating when "the point of arrest" has arrived, it is well settled that a temporary investigative detention must, of necessity, be truly "temporary and last no longer than is necessary to effectuate the purpose of the [detention]"—*i.e.,* transpire for no longer than necessary to confirm or dispel the officer's reasonable suspicion that criminal activity is afoot. [*U.S. v.*] *Sharpe,* 470 U.S. [675] at 684, 105 S.Ct. 1568 [84 L.Ed.2d 605 (1985)] (quoting *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983))[ ] . . . . In other words, a temporary investigative detention must "be reasonably related in scope to the circumstances which justified [the detention] in the first place," *State v. Silva,* 91 Hawai'i 80, 81, 979 P.2d 1106, 1107 (1999) (quoting *Sharpe,* 470 U.S. at 682, 105 S.Ct. 1568), and, thus, must be "no greater in intensity than absolutely necessary under the circumstances," *see Silva,* 91 Hawai'i at 81, 979 P.2d at 1107 (quoting *State v. Kaluna,* 55 Haw. 361, 369, 520 P.2d 51, 58–59 (1974)).

Moreover, while no single factor, in itself, is dispositive as to when a temporary investigative detention has morphed into an arrest, the potential attributes of "arrest" clearly include such circumstances as handcuffing, leading the detainee to a different location, subjecting him or her to booking procedures, ordering his or her compliance with an officer's directives, using force, or displaying a show of authority beyond that inherent in the mere presence of a police officer, as well as any other event or condition that betokens a significant deprivation of freedom, "such that [an] innocent person could reasonably have believed that he [or she] was not free to go and that he [or she] was being taken into custody indefinitely," *Kraus v. County of Pierce,* 793 F.2d 1105, 1109 (9th Cir. 1986). . . . We agree with the United States Court of Appeals for the Ninth Cir-

cuit that, "when determining whether an arrest has occurred, a court must evaluate all the surrounding circumstances, 'including the extent to which liberty of movement is curtailed and the type of force or authority employed.'" *United States v. Torres–Sanchez*, 83 F.3d 1123, 1127 (9th Cir.1996) (quoting *United States v. Robertson*, 833 F.2d 777, 780 (9th Cir.1987)). *Id.* at 124–26, 34 P.3d at 1023–25.

█ The *Ketchum* court ultimately held:

In summary, we hold that a person is "in custody" for purposes of article I, section 10 of the Hawai'i Constitution if an objective assessment of the totality of the circumstances reflects either (1) that the person has become impliedly accused of committing a crime because the questions of the police have become sustained and coercive, such that they are no longer reasonably designed briefly to confirm or dispel their reasonable suspicion or (2) that the point of arrest has arrived because either (a) probable cause to arrest has developed or (b) the police have subjected the person to an unlawful "de facto" arrest without probable cause to do so.

*Id.* at 126, 34 P.3d at 1025.

In the present case, the circuit court concluded in COL 7 that, "[w]hen Officer Adachi developed the conclusion that Defendant knew more about the vehicle than what he was saying, the questioning ceased to be brief and casual and became sustained and coercive, requiring *Miranda* warnings." Based on the record, we cannot agree.

It is undisputed that it was Wallace who returned to the vehicle and approached Officers Adachi and Rowe of his own volition. It is also uncontroverted that it was Wallace who initiated conversation with the officers by asking, "[W]hat was going on, what [they] were doing, what's up with the truck." After Wallace walked around the vehicle and indicated that he wanted the cigarettes out of the vehicle, Officer Adachi, thinking Wallace's actions were suspicious, asked Wallace what he knew about the vehicle, including whether he knew who was driving the vehicle or whether anybody else was in the vehicle. At this point, Officer Adachi's questions were brief and casual and clearly constituted noncustodial, on-the-scene questioning. In other words, Officer Adachi's questions were investigatory in nature, designed to confirm or dispel his suspicion that criminal activity was afoot.

Thereafter, when Wallace responded that he was at the scene when "haole Jeff" pulled up in the vehicle, parked it and fled, it is undisputed that "Wallace appeared nervous and jittery, would not make eye contact, and he kept playing with his clothes." Additionally, as the circuit court found in FOF 29, which the prosecution does not dispute, "[b]ased on the fact that [Wallace] matched the description of the driver coupled with his unusual behavior, Officer Adachi came to the conclusion that [Wallace] knew more than what he was telling police."

As previously indicated, the circuit court ruled that it was at this juncture that Wallace was in custody for *Miranda* purposes inasmuch as "the questioning ceased to be brief and casual and became sustained and coercive[.]" The record, however, evinces merely that, after being *Mirandized*, Wallace "eventually admitted that he was driving the vehicle, and that Jeff was with him in the vehicle." In other words, the record does not reveal with any degree of specificity the nature of the question or questions asked by Officer Adachi in eliciting Wallace's incriminating statement about driving the vehicle. Absent this evidence, we are unable to conclude as the circuit court did that, under an objective assessment of the totality of the circumstances, the questioning became sustained and coercive thereby triggering the protections afforded by *Miranda*. This conclusion is patently unsupported by the record.

Nonetheless, Wallace claims that:

Although Officer Adachi testified that Wallace was free to leave if he wanted to, there is no evidence in the record that this information was conveyed to Wallace. In fact, Officer Adachi directed Wallace "to stand to the side" while police were continuing their investigation of the truck. And, certainly at the point where Officer Adachi began to inform Wallace of his constitutional rights and instructed him to initial the police form, it would have been reasonable for Wallace to believe that po-

lice viewed him as a suspect and that he had to remain at the scene with police. Given Officer Adachi's conduct and show of authority, a reasonable person would not feel free to walk away.

Wallace appears to be arguing that an objective assessment of the totality of the circumstances reflects that the point of arrest had arrived because he was subjected to unlawful de facto arrest without probable cause to do so. Again, we cannot agree.

It was only in the context of being asked whether Wallace was "crowded or restrained by officers" that Officer Adachi replied in the negative, explaining, "I actually just told him to stand on the side, and we kept doing what we had to do with the vehicle." The record, therefore, reflects that Officer Adachi instructed Wallace "to stand on the side" not for the purpose of detaining Wallace, but so that he could continue the investigation without Wallace getting in the way.

As for the fact that Officer Adachi did not advise Wallace that he was free to leave the scene during the encounter:

> Though informing a suspect that he is not under arrest is one factor frequently considered to show lack of custody, see, e.g., [Oregon v.] Mathiason, 429 U.S. [492,] 495 [97 S.Ct. 711, 50 L.Ed.2d 714] [(1977)]; [United States v.] Stanley, 597 F.2d [866,] 869 [(4th Cir.1979)], it is not a talismanic factor. See, e.g., Berkemer v. McCarty, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984). Where[] ... the entire context indicates a lack of custody, failure to inform defendant of his status is not dispositive.

Davis v. Allsbrooks, 778 F.2d 168, 171–72 (4th Cir.1985). In the instant case, the record evinces that (1) Wallace voluntarily approached Officers Adachi and Rowe to engage them in conversation regarding the vehicle, (2) Wallace's liberty of movement was not curtailed in any significant manner, (3) no force was used during the encounter, (4) Wallace was not moved to a different location or physically restrained, and (5) neither Officer Adachi nor Officer Rowe displayed a show of authority beyond that inherent in the mere presence of a police officer. Therefore, Wallace's assertion that he was not free to leave the scene is belied by the record. Rather, the entire context of the encounter plainly indicates a lack of custody.

Furthermore, we reject Wallace's contention that the very giving of Miranda rights essentially produced a custodial interrogation. Numerous courts have held, and we hereby agree, that the precaution of giving Miranda warnings in a noncustodial setting does not transform that setting into a custodial interrogation for Miranda purposes. See, e.g., United States v. Bautista, 145 F.3d 1140, 1148 (10th Cir.1998); Davis 778 F.2d at 171–72; United States v. Charles, 738 F.2d 686, 694 n. 6 (5th Cir.1984), overruled on other grounds by United States v. Bengivenga, 845 F.2d 593 (5th Cir.1988) (en banc); United States v. Lewis, 556 F.2d 446, 449 (6th Cir.1977) (per curiam), cert. denied, 434 U.S. 863, 98 S.Ct. 193, 54 L.Ed.2d 137 (1977); State v. Haddock, 257 Kan. 964, 897 P.2d 152, 162–63 (1995), overruled on other grounds by State v. James, 276 Kan. 737, 79 P.3d 169 (2003); State v. Taillon, 470 N.W.2d 226, 229 (N.D.1991); State v. Doby, 273 S.C. 704, 258 S.E.2d 896, 899 (1979). In this case, the totality of the circumstances compels us to conclude for the reasons discussed supra that an innocent person in Wallace's position could not reasonably have believed that he or she was under arrest at the time of the encounter with Officers Adachi and Rowe.

As previously indicated, Wallace has the burden of proving custody. Naititi, 104 Hawai'i at 235, 87 P.3d at 904 (quoting Ketchum, 97 Hawai'i at 118, 34 P.3d at 1017). Inasmuch as an objective assessment of the totality of the circumstances fails to reflect either that (1) Wallace had become impliedly accused of committing a crime because Officer Adachi's questions became sustained and coercive, such that they were no longer reasonably designed briefly to confirm or dispel their reasonable suspicion or (2) the point of arrest had arrived because Wallace was subjected to unlawful de facto arrest without probable cause to do so, we hold that Wallace fails to sustain his burden of proof.

**B.** *Assuming Wallace was in Custody, Whether he Validly Waived his Miranda Rights*

■ Additionally, even assuming that Wallace was in custody for Miranda purposes,

we hold that he knowingly, intelligently, and voluntarily waived the privilege against self-incrimination and the right to counsel. The circuit court's ruling that the prosecution failed to meet its burden of proving that Wallace waived his *Miranda* rights is founded on Wallace's refusal to execute a written waiver of rights. Relying on this court's decision in *State v. Hoey*, 77 Hawai'i 17, 881 P.2d 504 (1994), the circuit court determined that Wallace's refusal to sign the waiver of rights portion of Form 103, followed by his agreement to nevertheless talk with police, amounted to an ambiguous and equivocal waiver of rights requiring clarification by Officer Adachi. We disagree.

In *Hoey*, the defendant, Hoey, indicated during the course of being advised of his *Miranda* rights in a custodial interrogation that he did not have money to "buy" a lawyer. 77 Hawai'i at 22, 881 P.2d at 509. On appeal, Hoey claimed that this statement should have been construed to be a request for counsel because it *demonstrated that he did not understand his right to court-appointed legal representation. Id.* at 33–34, 881 P.2d at 520–21. In addressing this contention, the court in *Hoey* began its analysis with the proposition that

> if a defendant makes an *unequivocal* request for counsel while being "Mirandized," all questioning must terminate until counsel is present. *Miranda*, 384 U.S. at 471–72, 86 S.Ct. at 1626–27. In other words,
>
>> once an accused has expressed his desire to deal with police interrogators only through counsel, he cannot be further questioned until counsel has been made available to him, unless the accused initiates further communication, exchanges, or conversations with the police. *Edwards v. Arizona*, 451 U.S. 477, 484–85 [101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378] ... (1981); *State v. Ikaika*, 67 Haw. 563, 566, 698 P.2d 281, 284 (1985); *State v. Brezee*, 66 Haw. 162, 657 P.2d 1044, 1046 (1983).
>
> This principle creates a bright-line rule that once the right to counsel has been invoked[,] all questioning must cease. *Smith v. Illinois*, 469 U.S. 91, 98 [105 S.Ct. 490, 494, 83 L.Ed.2d 488] ... (1984) (per curiam). *See also Solem v.*

*Stumes*, 465 U.S. 638, 646 [104 S.Ct. 1338, 1343, 79 L.Ed.2d 579] ... (1984). *State v. Mailo*, 69 Haw. 51, 53, 731 P.2d 1264, 1266 (1987).

*Id.* at 34, 881 P.2d at 521 (brackets, ellipses points, and emphasis in original).

The *Hoey* court observed, however, that:

> The cases cited above[ ] ... do not reach *the issue of a defendant's equivocal invocation of Miranda rights*, and the jurisdictions that have addressed it are split into three camps regarding whether cessation of questioning is required or whether the interrogating police officer may seek to clarify the meaning of a defendant's ambiguous statements. Those in the first camp have held that a defendant's ambiguous expression of interest in the presence of an attorney requires that further questioning cease altogether. Those in the second have required *clarifying* questions with regard to the defendant's comprehension or waiver of the right to counsel as a necessary precondition to further *substantive* questioning. Those in the third have found an effective waiver despite an ambiguous assertion of the right to counsel.

*Id.* at 34–35, 881 P.2d at 521–22 (citations omitted) (emphasis added). The *Hoey* court observed further that, in *Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the United States Supreme Court unqualifiedly sided with the third camp. *Id.* at 35, 881 P.2d at 522.

 On the issue raised by Hoey, this court held:

> we choose to afford our citizens broader protection under article I, section 10 of the Hawai'i Constitution than that recognized by the *Davis* majority under the United States Constitution by aligning ourselves with the jurisdictions in the "second camp" described above. Accordingly, we hold that (1) when a suspect makes an ambiguous or equivocal *request for counsel* during custodial interrogation, the police must either cease all questioning or seek nonsubstantive clarification of the suspect's request, and (2) if, upon clarification, the defendant unambiguously and unequivocally *invokes the right to counsel*, all substantive questioning must cease until counsel is

present. Conversely, we hold that if, upon clarification, the defendant voluntarily, knowingly, and intelligently waives the presence of counsel, substantive questioning may continue.

*Id.* at 36, 881 P.2d at 523 (emphases added).

With regard to Hoey's ambiguous statement that he did not have the money to "buy" a lawyer, this court opined that "one could easily draw the conclusion that Hoey had *failed to understand* that he could have a free lawyer appointed for him and that if he could have afforded a lawyer, he would have wanted one present." *Id.* at 37, 881 P.2d at 524 (brackets and internal quotation marks omitted) (emphasis added). Moreover, the detective's failure to clarify Hoey's ambiguous statement, "which was demonstrably inconsistent with [the detective]'s explanation of Hoey's *Miranda* rights, left unresolved the question whether Hoey had waived the right to counsel at his interrogation." *Id.* This court held, therefore, that "the prosecution failed to meet its burden of proving that Hoey voluntarily, knowingly, and intelligently waived his right to counsel at his interrogation, as guaranteed by article I, section 10 of the Hawai'i Constitution." *Id.*

The facts of the instant case stand in stark contrast to the facts in *Hoey.* Unlike in *Hoey,* it is undisputed here that Wallace fully understood his *Miranda* rights. Specifically, Officer Adachi advised Wallace using Form 103 that:

### WARNING OF RIGHTS

Before we ask you any questions, we want to tell you about your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advise [sic] before we ask you any questions and to have your lawyer with you during questioning.

5. The understanding of rights portion of the Form 103 used by Officer Adachi provides in pertinent part:

*UNDERSTANDING OF RIGHTS*

I understand the English language. I have read and heard this statement of my rights and I understand what my rights are.

If you cannot afford a lawyer one will be appointed for you before any questioning if you wish.

. . . .

As stated by the circuit court in FOFs 31 and 32:

31. Officer Adachi[ ] . . . read each line to Defendant, out loud, explained each right, and had Defendant initial next to each right, *indicating Defendant understood the right.*

32. Officer Adachi then had Defendant sign his name on the form *indicating Defendant understood his rights.*[5]

(Emphases added.) Consequently, this case does not present the issue in *Hoey* whether an ambiguous or equivocal request for counsel was made during custodial interrogation. Nor does this case present the related issue in *Hoey* whether the defendant understood the right to counsel. Rather, we are asked to address the issue whether Wallace's refusal to execute a written waiver of *Miranda* rights precludes a valid waiver in this case. *Hoey* is, therefore, non-dispositive.

■■■■ Turning to the issue of waiver, it is well established that, "[a]fter a defendant has been adequately apprised of his 'Miranda' rights, he 'may waive [effectuation of] these rights provided the waiver is made voluntarily, knowingly, and intelligently.' " *State v. Luton,* 83 Hawai'i 443, 454, 927 P.2d 844, 855 (1996) (quoting *State v. Kaahanui,* 69 Haw. 473, 478, 747 P.2d 1276, 1279 (1987) (citation omitted)) (brackets in original). To determine whether a valid waiver was given, this court must once again "examine the entire record and make an independent determination of the ultimate issue of voluntariness based on the totality of circumstances." *State v. Kekona,* 77 Hawai'i 403, 406, 886 P.2d 740, 743 (1994).

In the present matter, notwithstanding that Wallace refused to sign the waiver of rights portion of Form 103, it is uncontro-

Signed ___/s/ James Wallace Jr.___

Date_____ Time_____

"4/9/02" appears in the date block and "18:35" is listed in the time block.

verted, and the circuit court found in FOF 37, that "[Wallace] stated he was willing to talk to police[,] but he was not signing the form."[6] This court has observed that "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel guaranteed by the *Miranda* case." *State v. Henderson*, 80 Hawai'i 439, 442 911 P.2d 74, 77 (1996) (quoting *North Carolina v. Butler*, 441 U.S. 369, 375–76, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)) (internal quotation marks omitted). In *Butler*, 441 U.S. at 370–71, 99 S.Ct. 1755, the defendant, after being orally advised of his *Miranda* rights, refused to sign a written waiver form, stating "I will talk to you but I am not signing any form." Nevertheless, the defendant agreed to speak with officers, thereafter making inculpatory statements. *Id.* at 371, 99 S.Ct. 1755.

The United States Supreme Court held that the defendant's rejection of the written waiver did not preclude a finding that the suspect had waived his rights, reasoning:

> An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but it is not inevitably either necessary or sufficient to establish waiver. *The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case.* ... The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; *but in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated.*

*Id.* at 373, 99 S.Ct. 1755 (emphases added).[7]

Our examination of the record compels us to conclude that Wallace knowingly and voluntarily waived his *Miranda* rights. Specifically, the record reflects that Wallace was "adequately and effectively apprised of his

rights." *Butler*, 441 U.S. at 374, 99 S.Ct. 1755. Indeed, as previously indicated, Wallace does not dispute that he understood the warnings given to him. Furthermore, it is compelling to specify what the record in this case does not show regarding the circumstances of Wallace's waiver. Notwithstanding that Wallace refused to execute a written waiver of rights, it is undisputed that he "said nothing when advised of his right to the assistance of a lawyer. At no time did [Wallace] request counsel or attempt to terminate ... questioning." *Butler*, 441 U.S. at 371, 99 S.Ct. 1755. Additionally, there is no evidence whatsoever controverting Officer Adachi's account of the encounter at which the challenged statements were made. Nor does Wallace allege any facts that have traditionally cast doubt upon a finding of knowing and voluntary waiver, e.g.: (1) that the interrogation was lengthy or preceded by an incommunicado incarceration, *Miranda*, 384 U.S. at 476, 86 S.Ct. 1602; (2) that the defendant lacked education, *Davis v. North Carolina*, 384 U.S. 737, 742, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); (3) that the defendant exhibited weakness of will or mind, *Fikes v. Alabama*, 352 U.S. 191, 196–97, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); or (4) that there were hostilities incident to the defendant's arrest or custodial interrogation, *Beecher v. Alabama*, 389 U.S. 35, 38, 88 S.Ct. 189, 19 L.Ed.2d 35 (1967). *See State v. Harris*, 188 Conn. 574, 452 A.2d 634, 637 (1982). To the contrary, the record plainly reflects that Wallace freely agreed to talk with Officer Adachi.

Wallace points out that "courts in other jurisdictions have construed a refusal to sign a police waiver form as an ambiguous assertion of the suspect's right to counsel and to silence[,]" citing *United States v. Heldt*, 745 F.2d 1275, 1278 (9th Cir.1984); *United States v. Van Dusen*, 431 F.2d 1278 (1st Cir.1970); *United States v. Nielsen*, 392 F.2d 849 (7th Cir.1968); *Millican v. State*, 157 Ind.App. 363, 300 N.E.2d 359 (1973); and *People v.

**6.** On cross-examination, when asked how he determined that Wallace was still willing to speak to him, notwithstanding his (Wallace's) refusal to execute the waiver of rights portion of MPD Form 103, Officer Adachi stated:

> I asked him if he wanted—if he was willing to sign. He refused. He said no, I'm not signing it. So I asked him if he was willing to talk to

us—he wanted to talk to us or wanted to sign the form. *And he said he would talk to us, but he wasn't signing the form.*

**7.** As noted by the Court in *Butler*, the federal courts have unanimously rejected the claim that refusal to sign a written waiver form precludes a finding of waiver. *Id.* at 375 n. 5, 99 S.Ct. 1755.

*Coleman,* 43 N.Y.2d 222, 401 N.Y.S.2d 57, 371 N.E.2d 819 (1977). These cases are, however, distinguishable on their facts.

Unlike the instant case, the defendant's refusal to execute a written waiver in *Nielsen, Millican,* and *Heldt* was coupled with additional facts mitigating against effective waiver. Specifically, in *Nielsen* and *Millican,* the respective defendants explicitly indicated that they would not sign a written waiver form *until they had talked to an attorney. Nielsen,* 392 F.2d at 852; *Millican,* 300 N.E.2d at 360. Only in this context did the *Nielsen* and *Millican* courts construe the defendants' subsequent willingness to talk as an equivocal invitation, requiring inquiry "before continuing the questioning to determine whether [the] apparent change of position was the product of intelligence and understanding or of ignorance and confusion." *Nielsen,* 392 F.2d at 853; *Millican,* 300 N.E.2d at 363 (quoting *Nielsen* ). Additionally, in *Heldt,* the defendant, upon being advised of his *Miranda* rights, "told [the FBI agent] he understood his rights *but did not wish to waive them,* that he refused to sign the waiver form, and that *he told [the FBI agent] he did not wish to answer questions.*" 745 F.2d at 1276 (emphases added). It was under these circumstances that the *Heldt* court held that the FBI agent's "subsequent exhortation to 'answer questions anyway' was improper[,]" and the prosecution had failed to sustain its burden of proving a knowing and voluntary waiver. *Id.* at 1278.

As for *Coleman* and *Van Dusen, Coleman* involved the waiver of the right to counsel in the context of a *lineup* wherein the defendant refused to execute a statement acknowledging that he had been informed of the right to counsel. 401 N.Y.S.2d 57, 371 N.E.2d at 822. In *Van Dusen,* the defendant was given an "advice of rights" form to read prior to questioning but was not orally advised of his rights. 431 F.2d at 1279–80. The defendant refused to execute the waiver of rights portion of the form. *Id.* at 1280. However, when asked by the FBI agents, the defendant indicated that he understood his rights and was willing to talk. *Id.* On appeal, the defendant argued that in the face of his refusal to sign the waiver, the agents should have orally advised him of his *Miranda* rights. *Id.* Although observing that "an oral

presentation of . . . rights would have added little[,]" the *Van Dusen* court suggested in dictum that it would have been prudent for the agents to advise the accused that his failure to sign the waiver would not prevent statements from being used against him. *Id.* Still, the *Van Dusen* court expressly rejected this "proscriptive code approach[,]" stating "[i]t would, we think, be folly to try to cast this principle in the form of a specific required practice." *Id.* at 1280–81. The *Van Dusen* court continued, "[i]ndeed, were we so to rule, a suspect could, by refusing to sign and subsequently talking freely, enjoy the luxury of an immunity bath at no price at all." *Id.* at 1280. Moreover, the *Van Dusen* court ultimately held that the prosecution had met its burden of proving waiver. *Id.* at 1281.

As reflected *supra,* each of the cases cited by Wallace involves factual circumstances critically distinct from the instant case; consequently, his reliance upon them is unavailing. Accordingly, because (1) "[r]efusal to sign a waiver form or a written statement, although some evidence of the absence of waiver, may be outweighed by affirmative conduct indicative of a knowingly and intelligently made decision not to remain silent" and to waive the right to counsel, *Harris,* 452 A.2d at 637, and (2) as discussed *supra,* the circumstances of the instant case evince that Wallace's undisputed willingness to speak constituted an explicit, affirmative act evidencing a knowing, intelligent, and voluntary waiver, we hold that the prosecution satisfied its burden of proof.

## IV. CONCLUSION

For the foregoing reasons, we hold that the circuit court erred in granting Wallace's motion to suppress statements. We, therefore, vacate the circuit court's June 12, 2003 FOF, COL and order and remand for proceedings consistent with this opinion.

Concurring Opinion by ACOBA, J.

I concur on the ground that, on the state of the record, the evidence indicates that Defen-

dant impliedly waived his right against self incrimination.