221 P.3d 491

**STATE of Hawai'i, Plaintiff–Appellant,**

v.

**Randal STRONG, Jr., Defendant–Appellee,**

and

**Maliepo Sitani, Defendant.**

**No. 29130.**

Intermediate Court of Appeals of Hawai'i.

Nov. 25, 2009.

---

**514**

Donn Fudo, Deputy Prosecuting Attorney, on the briefs, for Plaintiff–Appellant.

Richard D. Gronna, Esq., on the briefs, for Defendant–Appellee.

NAKAMURA, C.J., and FUJISE and LEONARD, JJ.

Opinion of the Court by LEONARD, J.

Plaintiff–Appellant State of Hawai'i (**State**) appeals the Order Granting in Part and Denying in Part Defendant's Motion to Suppress Evidence and Statements, Findings of Fact, and Conclusions of Law (**Suppression Order**), filed on April 7, 2008, in the Circuit Court of the First Circuit (**Circuit Court**).[1]

On appeal, the State contends that the Circuit Court erred by granting in part the motion to suppress evidence of incriminatory statements made by Defendant–Appellee Randal Strong, Jr. (**Strong**) while he was in police custody. We agree with the State and conclude that Strong's statements should not be suppressed.

## I. BACKGROUND

On July 13, 2006, a grand jury returned a multi-count indictment, charging Strong with: Count II, Robbery in the Second Degree in violation of Hawaii Revised Statutes (**HRS**) § 708–841(1)(a) (1993), stemming from a February 26, 2006 convenience store robbery; Count IV, Theft in the Third Degree in violation of HRS § 708–832(1)(a) (1993), stemming from a March 4, 2006 convenience store theft; Count VI, Robbery in the Second Degree in violation of HRS § 708–841(1)(b) (1993), stemming from a March 10, 2006 convenience store robbery; Count VIII, Robbery in the Second Degree in violation of HRS § 708–841(1)(b), stemming from a March 16, 2006 convenience

---

1. The Honorable Michael D. Wilson presided.

store robbery; and Count X, Robbery in the Second Degree in violation of HRS § 708–841(1)(b), stemming from a March 19, 2006 convenience store robbery.

On September 24, 2007, Strong filed a Motion to Suppress Evidence and Statements (**Motion to Suppress**), seeking to suppress any and all statements he made to police officers and the fruits of those statements. A hearing on the Motion to Suppress was held on November 19 and December 7, 2007. The State called Officer Steven Kaniho of the Honolulu Police Department (**HPD**) and stated its offer of proof as follows:

> On August 4th 2004, Officer Kaniho, then Detective Kaniho, arrested Mr. Strong at Kam IV housing, took him to the Kalihi police station where he advised Mr. Strong of his constitutional rights, using the standard HPD 81 in connection with his Assault in the Second Degree investigation under report number 04–228880.

> Mr. Strong had a copy of the form. He reviewed it. He initialed the form indicating that he understood his rights. He did not want an attorney. He wanted to state what happened. He signed and dated the form, then Detective Kaniho did the same, and then Mr. Strong gave a lengthy statement during which he never asked for an attorney nor did he ask for (indiscernible) to cease. That's the State's offer.

A copy of the HPD–81 form, filed under HPD Report No. 04–228880 from August 4, 2004, was admitted as State's Exhibit 1.

Officer Tazman McKee (**Officer McKee**) then testified that he was the lead investigator for a Robbery in the Second Degree investigation under HPD Report No. 06–112065. Officer McKee stated that Strong was a suspect and that he learned that Strong had been arrested on March 19, 2006 in connection with HPD Report No. 06–112065. Officer McKee attempted to obtain a statement from Strong on March 20, 2006 at approximately 2:40 a.m. regarding HPD Report No. 06–112065. Officer McKee stated that he informed Strong of his constitutional rights through the use of a HPD–81 form, a copy of which was admitted into evidence as State's Exhibit 2. Officer McKee informed Strong that he wanted to question him about a robbery that occurred on March 19, 2006. Officer McKee related that Strong understood what Officer McKee told him, did not request an attorney, but that Strong refused to speak with him about what happened. The interview was then terminated. Officer McKee stated that the purpose of the interview was "strictly for March 19th," and he had informed Officer Derrick Kiyotoki (**Officer Kiyotoki**) that Strong did not request an attorney, but declined to make a statement.

Officer Kiyotoki was then called to testify. Officer Kiyotoki stated that he was familiar with the HPD–81 form and that it was used to advise suspects of their constitutional rights. Officer Kiyotoki was the lead investigator for HPD Report Nos. 06–081736, 06–090101, 06–099953, and 06–107237, which were related to four criminal investigations in which Strong was a suspect.

The Circuit Court then inquired about an HPD–81 form that referenced a robbery on February 26, 2006. State's Exhibit 3, a copy of an HPD–81 form, filed under Report No. 06–081736 was entered into evidence. This form stated that Officer Kiyotoki was going to ask Strong "about Robbery which occurred on 2–26–06 at 1900 Dillingham Blvd, but I first want to inform you of certain rights you have under the Constitution. Before I ask you any questions you must understand your rights." Strong initialed the HPD–81 form to indicate that he understood his rights, did not want an attorney now, and would like to tell Officer Kiyotoki what happened. Both Strong and Officer Kiyotoki then signed and dated the HPD–81 form.

State's Exhibits 5 through 10 were also admitted. State's Exhibit 8 is a transcript of Officer Kiyotoki's interrogation of Strong on March 20, 2006 from 8:33 a.m. to 9:05 a.m. The relevant portions of the interrogation are as follows:

> Q. Derrick Kiyotoki, Honolulu Police Department, Robbery Detail. The following tape recorded interview with Randal Strong, Junior is taking place at the Alapai Police Station, Cellblock Interview Room Number 1. Today's date is March 20th, 2006, Monday, and the pres-

ent time is 8:35 a.m. Okay, for the record, state your full and correct names?

A. Randal Lee Strong, Junior.

. . . .

Q. Okay, [ ] old are you?

A. [ ], 20.

. . . .

Q. Okay, how much education do you have, Randy?

A. I went up to the eighth grade.

Q. Okay, are you able to write in English?

A. Yes.

Q. Okay, are you able to read in English?

A. Yeah.

Q. Do you have any difficulty in understanding me?

A. No.

Q. Okay, have you consumed any alcohol during the past twenty-four hours?

A. No.

Q. Have you taken any medication prescribed by a doctor during the past twenty-four hours?

A. No.

Q. Have you taken any drugs not prescribed by a doc—not prescribed by a doctor during the past twenty-four hours?

A. No.

Q. Okay, did anyone promise you anything to make a statement?

A. No.

Q. Did I promise you anything to make a statement?

A. No.

Q. Okay, did anyone coerce, threaten or force you to make a statement?

A. No.

Q. Did I coerce, threaten or force you to make a statement?

A. No.

Q. Okay, you are volunteering on your own free will to make a statement and answer questions?

A. Yeah.

Q. Okay, placed before you is your constitutional rights, okay. And the report you're going to be interviewed under, Randal, is 06–081736, okay. And the title of this form is Warning Persons Being Interrogated of Their Constitutional Rights, okay. Randal Strong, Junior, do you know that you are in the custody of me, Detective Derrick Kiyotoki, at the Alapai Police Station?

A. Yes.

Q. Can you put your initials in the Yes block, please. Okay, Randal, I'm going to ask you questions about a robbery which occurred on 2–26–06 at 1900 Dillingham, this is the 7–Eleven. But first I want to inform you of certain rights you have under the Constitution. Before I ask you any questions, you must understand your rights, okay. Number one, you have the right to remain silent. Two, you don't have to say anything to me or answer any of my questions. Three, anything you say may be used against you at your trial. Number four, you have the right to have an attorney present while I talk to you. If you cannot afford an attorney, the court will appoint one for you prior to any questioning. Number six, if you decide to answer my questions without an attorney being present, you still have the right to stop answering me at any time, okay. Do you understand what I have just told you, Randy?

A. Yeah.

Q. Okay, initial in the appropriate block. Do you want an attorney now?

A. No.

Q. Okay, and would you like to tell me what happened?

A. Yeah, I going answer your questions.

Q. Okay, can you put your initials. Okay, on the following line, Randy, can you sign your name on the bottom where it says Name. Okay, also your address, okay, and the next one is the date and today's date is 3–20–2006 and the present time you're signing the document is 8:38 a.m. Okay, Randy, also in conjunction with this investigation, I have three other cases, two which are robberies,

and another one which is a theft, yeah. I'll talk to you about that, okay.

A. Yeah.

Q. Okay, Randy, first of all, what I want to talk to you about this incident that occurs at the 7–Eleven, Dillingham Boulevard. I believe the closest cross reference is Mokauea Street, yeah. And this incident occurs on Sunday, February 26, about 4:00 in the morning, okay. And this incident involves a beer run, yeah. Subsequently as a result of my investigation, there were some video surveillance tapes recovered in this incident, okay. And this video surveillance clearly depicts you as going into the vault— the beer vault taking beer from this establishment, okay. You recall this incident?

A. Yeah.

. . . .

Q. Okay. All right, you realize your constitutional rights are still in effect?

A. Yeah.

Q. Okay, I want to talk about this other case and this is a theft case, yeah. And this occurs at the same 7–Eleven but this is on March 4th, the same time, about 4:00 in the morning, okay. And again the surveillance photograph, okay, of a male, who I believe is you, and another male, who I believe is Maliepo Sitani, going into the 7–Eleven again grabbing beer. This is couple days later, okay. This is a week later, on Saturday, about 4:00. You remember going to the store?

A. No.

. . . .

Q. Okay. All right, you realize your constitutional rights are still in effect, right?

A. Yes.

Q. Okay, we'll talk about this other case, okay. And this occurs on March 16th, okay, this is a Robbery in the Second Degree, report number 06–107237, okay, and this occurs on a Thursday. Wait, wait now, hold on. I'm sorry, let's go back, backtrack. Sorry. Okay, this occurs on the 10th of March, this is about 10:00 in the evening, this is 7–Eleven on North King by Farrington. And this is a Robbery in the Second Degree, 06–099953, okay, it's a Robbery in the Second Degree, okay. Do you remember going into this 7–Eleven Store on King Street?

A. Yeah.

. . . .

Q. Okay, Randy, the last and final one, okay. You realize your constitutional rights are still in effect?

A. Yes.

Q. Okay, this is a Robbery Second, this occurred approximately ten days after this incident on North King, and this is recorded under report number 06–107237, and this is a Robbery in the— Robbery at the North School Street 7–eleven, 2404 North School. And this occurs Thursday, 3–16–06, about 2:00 in the morning. Do you remember being involved in an incident over there? And this is the 7–Eleven Store, same store where you guys were picked up recently. You remember being involved in an incident over there?

A. Yeah.

. . . .

Q. What we going have to do [sic], Randy, is go up to my office and play it on a computer, okay. These are all surveillance videos on a disc, okay. You realize that your constitutional rights are in effect?

A. Yeah.

Q. Okay, you waive your constitutional rights?

A. What you mean?

Q. You gave up those rights and you wanted to give me a statement without a lawyer being here,—

A. Yeah.

Q. —without remaining silent. Was this statement given freely and voluntarily on your own free will?

A. Yes.

Q. Okay, did I coerce, threaten or force you to make a statement?

A. No.

Q. Did all of the events which you spoke about happen within the City and County of Honolulu?

A. What you mean, down here?

Q. Yeah.

A. Yes.

Q. And most important, did you understand your constitutional rights?

A. Yes.

At the hearing on the Motion to Suppress, Officer Kiyotoki admitted that he knew about four other incidents and intended to question Strong about them prior to preparing the HPD–81 form referencing only a robbery on February 26, 2006. Officer Kiyotoki admitted that he could have included other dates on the form but in his experience "when you put a whole bunch of cases down on the HPD 81 sometime[s] there's a little psychological edge to the defendant that he's—he's being bombarded by all these cases so I—I—I don't like to use that sometimes."

The Circuit Court then questioned Officer Kiyotoki as follows:

The Court: Maybe I can just ask the question to make it a little bit more direct.

Officer Kiyotoki, you had mentioned that you had not placed the other incidents, February 26 incident, the March-excuse me, the March 4th incident, the March 10th incident, the March 16th incident on the HPD 81 because you find sometimes it makes a defendant feel somewhat bombarded?

The Witness: Correct.

The Court: And then you did mention those incidents, although not by date, you did mention them shortly afterwards in the transcript. Do you remember that?

The Witness: Yes, I did.

The Court: Okay. What was your thought about the timing then? Why did you bring it up at that point?

The Witness: When I ask someone their constitutional rights or warn them of their constitutional rights, I get a kind of a feel, some type of rapport that I'm getting from this individual. Some people will just .. some suspects will just clam up to us, to our questioning.

The Court: Uh-hum?

The Witness: Some people will be cooperative.

The Court: Uh-hum?

The Witness: And I kind of feel them out at that point as to how should I gauge this interview. And in this situation Mr. Strong was very cooperative and I felt that at this point I should warn him of, you know, question him about the other cases.

Upon further examination, Officer Kiyotoki testified as follows:

Q. You knew based on your discussion with Detective McKee that Mr. Strong had declined to make a statement at approximately 2:47 that morning; right?

A. That is correct.

Q. And again for purposes of explaining what—your thought process and what happened when you went down there, as you went down to see Mr. Strong at about—what time is the HPD 81 dated or timed?

A. It's at 8:39 a.m.

Q. In your mind did you have any expectation one way or other of whether or not Mr. Strong was going to give you a statement about anything?

A. At that point I thought that Mr. Strong was not going to give me a statement.

Q. And why were you thinking that?

A. Because he refused to provide a statement to Detective Tasman McKee earlier.

Q. Again about this different incident?

A. Exactly.

. . . .

Q. And would it be fair to say that you initially advised him that the scope of your questioning would be in regards to the incident that happened, the robbery which happened on February 26, 2006 at 1900 Dillingham Boulevard?

A. That is correct.

. . . .

Q. Now for purposes of explaining what happened next, what are you thinking at this point when Mr. Strong essentially tells you he wants to talk?

A. At that point I'm totally—I'm cut off guard.

Q. Why are you cut off?

A. I'm surprised that, hey, he's going to talk to me. He's willing to make a statement. So I'm surprised at that point.

. . . .

Q. Okay. He tells you he wants to make a statement—or he wants to answer your questions?

A. Correct.

Q. What happens next?

A. What I have him do is sign the form with his signature as well as with his address and the date and he signs the form. And at the same time when he's doing that I am also telling him that I am going to speak to him about two other robberies and another theft case.

Q. Why did you make that statement to him at that point about questioning about two other robberies and the theft case?

A. To let him know that I was going to speak to him about other cases.

Q. And this was because it appeared that he wanted to talk?

A. Exactly.

Q. Why not the other way around? He goes yeah, I like tell you what happened or I want to answer your questions—on page 5, line 18. So you know he wants to talk; correct?

A. Correct.

Q. Why not at that point say well, I'd like to ask you about two other robberies and another theft, why—why the sequence this way as opposed to the one I just proposed?

A. Because for one thing I wanted to make sure that he knew what, you know, he was signing at that point, and also that I was going to talk to him about other cases.

On cross-examination, Officer Kiyotoki testified as follows:

Q. Okay. Now, at the time that you were going to go in and talk with Mr. Strong you had taken some time to go back into your files to review the other robberies that you were investigating, didn't you?

A. Prior to that, yes.

Q. And you had the police report numbers for those robberies, didn't you?

A. Correct.

Q. And when you were going in there to talk with Mr. Strong you testified earlier I think that you weren't sure how he was going to react to you; right?

A. Correct.

. . . .

Q. Sure. When you went in to go talk with Mr. Strong you were aware of the other robberies you wanted to talk to him about?

A. Yes.

Q. Okay. And you wanted to talk to him about those other robberies too, didn't you?

A. Yes.

. . . .

Q. Okay. And so you had actually gone in knowing about these other robberies, you didn't prepare an HPD 81 form, did you?

A. I—I did.

Q. Not to the other robberies?

A. No, I didn't.

Q. Okay. The only robbery you prepared was just this one pertaining to the 26th of February; right?

A. Correct.

Q. And this is even though you knew that you wanted to obtain a possible statement from Mr. Strong about those other robberies; right?

A. Correct.

. . . .

Q. Okay. So basically what you did then you went and worked up a rapport to just say I just want to talk to but this one thing but you had intend [sic] today

talk with him about all the other robberies as well; isn't that right?

A. That's correct.

Q. You didn't tell him about that about the time he gave you his permission to talk to you?

A. At the time he was signing the document I also mentioned to him that I was going to speak to him about two other robberies and a theft.

. . . .

Q. Okay. And it was at that point that you—that you then told him you were going to talk to him about those other cases as well; right?

A. My intentions prior to this was to speak to him about all these robberies.

Q. But you didn't tell him that?

A. Not until I got him to agree to his constitutional rights.

. . . .

Q. Okay. So my question is that if you wanted to go and talk with him and he signed on to this why didn't you prepare three other HPD 81 forms to advise him of his rights to talk to but those other cases?

A. Because like I testified earlier I didn't want to overwhelm him where he would shut down.

Q. Well, wait a minute. How could he have been overwhelmed at that point if he was going to agree to test—talk to you about this case, right, and then after he signs on to this he then—you then tell him that you're going to talk to him about the other cases and he agrees to talk with you, how would he be overwhelmed?

A. Sometimes psychologically when you put it down on paper they become afraid, they clam up, they close on you.

Q. And you don't think that that has some bearing on other—

A. No, because I verbally warned him that I was going to talk to him about two other robberies.

Q. So at that—so at that point then it would be your opinion that the confession that he would give you or his cooperation really wouldn't be that intelligent, would it, wouldn't be knowingly, would it?

A. Well, he was informed, you know—

Q. He was informed that you were going to talk to him about a robbery on February 26, that's what he agreed to do?

A. And two other robberies and a theft.

Q. After you had him agree and sign this form; right?

A. And he agreed that I could talk to him about it.

In closing, the State argued, *inter alia,* that Strong was advised about the discussion of additional crimes immediately following his signature on the HPD–81 form. Strong argued that Officer Kiyotoki should have advised Strong about his rights as to each of the crimes the officer wished to speak to Strong about.

On April 7, 2008, the Circuit Court entered the Suppression Order, suppressing Strong's statements regarding the theft on March 4, 2006, the robbery on March 10, 2006, the robbery on March 16, 2006, and all the fruits therefrom. The Circuit Court denied Strong's request to suppress statements regarding the robberies on February 26, 2006 and March 19, 2006. The State timely filed this appeal. *See* HRS § 641–13(7) (Supp. 2007) (allowing an appeal by the State in a criminal case from "a pretrial order granting a motion for the suppression of evidence").

## II. *STANDARD OF REVIEW*

This court has previously stated the standard of review for a motion to suppress evidence as follows:

Appellate review of factual determinations made by the trial court deciding pretrial motions in a criminal case is governed by the clearly erroneous standard. A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is left with a definite and firm conviction that a mistake has been made. The circuit court's conclusions of law are reviewed under the right/ wrong standard. Furthermore, ... the

proponent of a motion to suppress has the burden of establishing not only that the evidence sought to be excluded was unlawfully secured, but also, that his own . . . rights were violated[.]

*State v. Balberdi*, 90 Hawai'i 16, 20, 975 P.2d 773, 777 (App.1999) (quoting *State v. Anderson*, 84 Hawai'i 462, 467, 935 P.2d 1007, 1012 (1997)).

Consequently, we "review the circuit court's ruling on a motion to suppress *de novo* to determine whether the ruling was right or wrong." *State v. Eleneki*, 106 Hawai'i 177, 179, 102 P.3d 1075, 1077 (2004).

## III. *DISCUSSION*

On appeal, the State challenges numerous Findings of Fact (2–18) and Conclusions of Law (1–9). The central issue, however, is whether the State met its burden of showing that Strong was adequately advised of his constitutional rights and that he waived them with respect to each of the four crimes that he was questioned about by Officer Kiyotoki. For the reasons discussed below, and based on the totality of the circumstances surrounding Strong's custodial interrogation, we conclude the Circuit Court erred by suppressing Strong's statements regarding the March 4, 10, and 16, 2006 incidents because the State demonstrated that Strong was advised of his constitutional rights regarding those cases and knowingly, voluntarily, and intelligently waived them.

 Our analysis begins with the following constitutional principles:

Under the fifth amendment to the United States Constitution and article 1, section 10 of the Hawai'i Constitution, [n]o person shall . . . be compelled in any criminal case to be a witness against himself or herself. When a confession is obtained in violation of either of these provisions, the

prosecution will not be permitted to use the confession to secure a defendant's criminal conviction.

. . . .

The burden is on the prosecution to show that the statement was voluntarily given and not the product of coercion.

*State v. Gella*, 92 Hawai'i 135, 142–43, 988 P.2d 200, 207–08 (1999) (internal quotation marks and citations omitted).

 In *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), the United States Supreme Court held that "a suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." 479 U.S. at 577, 107 S.Ct. 851. Defendant John Leroy Spring (**Spring**) had been arrested for firearms violations. *Id.* at 566, 107 S.Ct. 851. Prior to Spring's arrest, law enforcement agents received information that Spring killed a man in Colorado. *Id.* Spring signed a written form stating that he understood and waived his *Miranda* rights but was not advised as to the topics of the interrogation. *Id.* at 567, 107 S.Ct. 851. After being questioned about the firearms violations, law enforcement agents inquired whether Spring had shot anyone. Spring admitted, "I shot another guy once." *Id.* Agents then asked Spring if he shot a man in Colorado, which he denied. *Id.* In a subsequent interrogation and while still under arrest for the firearms violations, Spring was again given the *Miranda* warnings,[2] signed a written waiver, and admitted that he killed a man in Colorado. *Id.* at 567–68, 107 S.Ct. 851. On appeal, Spring argued that he did not waive his *Miranda* rights during the first interview because "he was not informed that he would be questioned about the Colorado murder." *Id.* at 569, 107 S.Ct. 851.

---

**2.** The requirement of *Miranda* warnings is triggered by two criteria: (1) the defendant must be under interrogation; and (2) the defendant must be in custody. *See, e.g., State v. Wallace*, 105 Hawai'i 131, 137, 94 P.3d 1275, 1281 (2004). The United States Supreme Court held in *Miranda*:

Prior to any questioning, the person must be warned that he has a right to remain silent,

that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.

*Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Citing *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986), the Supreme Court stated in *Spring* that a waiver of Fifth Amendment rights depends upon: (1) whether the decision was a deliberate choice or the product of intimidation, coercion, or deception; and (2) made with full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it. 479 U.S. at 573, 107 S.Ct. 851. The Supreme Court noted that there was no allegation of physical violence or other deliberate means calculated to break Spring's will. *Id.* at 573–74, 107 S.Ct. 851. The allegation that police failed to supply Spring with certain information did not relate to any of the traditional indicia of coercion, *i.e.*, diverse pressures which sap or sustain a suspect's powers of resistance and self-control. *Id.* at 574, 107 S.Ct. 851. "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege." *Id.* "Once *Miranda* warnings are given, it is difficult to see how official silence could cause a suspect to misunderstand the nature of his constitutional right"—"his right to refuse to answer any questions which might incriminate him." *Id.* at 576, 107 S.Ct. 851 (citation omitted). The Supreme Court stated, "This Court has never held that mere silence by law enforcement officials as to the subject matter of an interrogation is 'trickery' sufficient to invalidate a suspect's waiver of *Miranda* rights, and we expressly decline so to hold today." *Id.* The dissent in *Spring*, however, noted that the law enforcement agents did not specify any subject for questioning when Spring waived his *Miranda* rights and commented that it was "self-evident that a suspect's decision to waive this privilege will necessarily be influenced by his awareness of the scope and seriousness of the matters under investigation." *Id.* at 578–79, 107 S.Ct. 851.

Shortly after the *Spring* decision, the Hawai'i Supreme Court dealt with a similar issue in *State v. Ramones*, 69 Haw. 398, 744 P.2d 514 (1987). Radford John Ramones (**Ramones**) was initially interviewed about an auto theft. *Id.* at 400, 744 P.2d at 515. Ramones signed a form relating to a charge of auto theft and waived his *Miranda* rights.

*Id.* During the interview, Ramones made statements that resulted in an indictment against him for the offense of unauthorized control of a propelled vehicle, instead of a broader offense of auto theft. *Id.* Romones had moved to suppress incriminating statements by claiming that he did not waive his *Miranda* rights "because he did not know the true nature of the charges against him during the interrogation." 69 Haw. at 401, 744 P.2d at 516. The trial court suppressed Ramones's statements because Ramones waived his rights to an automobile theft charge, not a charge of unauthorized control of a propelled vehicle. *Id.* at 399, 744 P.2d at 514.

In *Ramones*, the Hawai'i Supreme Court answered the following questions:

1. Whether the trial court erred by suppressing Ramones's statement based on the conclusion that the effectiveness of his *Miranda* rights waiver depended on the nature of the charges against him at the time of interrogation? YES.

2. Whether it was unnecessary to rewarn Ramones where the interrogating police officer had already obtained a valid waiver of *Miranda* rights? YES.

*Id.* at 402, 744 P.2d at 516. The *Ramones* court stated, "We agree with the United States Supreme Court's recent decision of *Colorado v. Spring*, 479 U.S. 564, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987), that a suspect's awareness of all the possible subjects of the police questioning is not relevant to determine whether the suspect voluntarily, knowingly, and intelligently waived his *Miranda* rights." 69 Haw. at 403, 744 P.2d at 517. With respect to the issue of rewarning of *Miranda* rights, the court in *Ramones* further stated:

This is not a true staleness issue. The issue of rewarning is merely the flip side of the first issue: must arrestees be "Mirandized" for every single statutory offense possible? Once *Miranda* warnings are given, they need not be given again in the same interrogation even if other offenses materialize or become more appropriate.

*Colorado*, 479 U.S. at 575, 107 S.Ct. at 858, 93 L.Ed.2d at 967.

*Id.* at 406, 744 P.2d at 518.[3]

Strong rests his argument that he did not waive his *Miranda* rights as to the March 4, 2006 theft or the March 10 and 16, 2006 robberies on Justice Acoba's concurring opinion in *State v. Poaipuni*, 98 Hawai'i 387, 49 P.3d 353 (2002). We agree that, at first blush, Justice Acoba's concurrence, which was joined by Justice Levinson, seems to support Strong's position. *See Poaipuni*, 98 Hawai'i at 398–401, 49 P.3d at 364–67.[4]

The defendant in that case, Peter Alvin Poaipuni (**Poaipuni**), was convicted and sentenced for an unlawful possession of a firearm. *Id.* at 388, 49 P.3d at 354. The majority opinion concluded that Poaipuni's confession and the firearms found in a toolshed located on the same property as the residence he shared with other family members were inadmissible because they were the fruit of an unlawful warrant for a search of the residence. *Id.* at 394–95, 49 P.3d at 360–61.[5] The majority opinion by Justice Levinson, joined by Chief Justice Moon and Justice Acoba, did not address whether the *Miranda* warning given to Poaipuni was constitutionally infirm as to the firearms charge. *Id.* at 392–95, 49 P.3d at 358–61. Chief Justice Moon wrote a separate concurrence to emphasize his

strong belief that the court should not address the issue of whether Poaipuni's Fifth Amendment right against self-incrimination was violated. *Id.* at 401–02, 49 P.3d at 367–68. The dissenting opinion by Justice Ramil, joined by Justice Nakayama, would have held that the consensual search that led to the discovery of the firearms was not tainted by the prior illegal search of the Poaipuni home *and* that Poaipuni's custodial statement regarding the firearms was "knowingly, voluntarily, and intelligently made pursuant to his *Miranda* rights." *Id.* at 402, 49 P.3d at 368. Justice Acoba wrote separately to respond to the dissent's view that there was no *Miranda* violation, opining that Poaipuni was not adequately advised of his rights with respect to the firearms charge. *Id.* at 395–401, 49 P.3d at 361–67. Thus, the *Poaipuni* case is, at best, advisory on the issue before us.

Justice Acoba's concurring opinion extensively quoted the following testimony:

Q [PROSECUTOR]: What happened after he finished reading the rights?

A [DETECTIVE HOLOKAI]: When he was through reading the waiver of rights, I asked him if he wanted to give a statement regarding the investigation, and [Defendant] stated that he would, and then he signed under the waiver of rights section,

---

**3.** In *State v. Nelson*, 69 Haw. 461, 748 P.2d 365 (1987), the supreme court affirmed a trial court's suppression of a defendant's statement because he did not waive his privilege against self-incrimination provided by the Hawai'i Constitution. 69 Haw. at 471, 748 P.2d at 372. The court in *Nelson* rejected the State's contention that the interrogating officers did not need to "re-Mirandize" the defendant when he was again interrogated, two days after the initial interrogation during which he unequivocally waived his right to have counsel present during questioning. *Id.* at 471, 748 P.2d at 371. The *Nelson* court restated that, "[o]nce *Miranda* warning are given, they need not be given again in the same interrogation even if other offenses materialize or become more appropriate." *Id.* However, the court in *Nelson* distinguished *Ramones*, because "[u]nlike Radford John Ramones, Kurt Lance Nelson was subjected to questioning more than once." *Id.* at 471, 748 P.2d at 372. *Nelson* nevertheless repeated the holding in *Ramones* that once a defendant is given his *Miranda* rights, he need not be given his rights again in the same interrogation and reinforced the requirement

that a defendant must be advised of his *Miranda* rights before each separate interrogation. *Id.*

**4.** We note that the State did not respond to Strong's arguments based on the *Poaipuni* case, instead submitting an HRAP Rule 28(d) letter, which notified the court that it would not be filing a reply brief. As the *Poaipuni* case was not mentioned in the State's opening brief, a reply might have been helpful to the court in this instance. We are, nevertheless, charged with following supreme court precedent. Thus, we carefully analyzed the opinions in *Poaipuni* to determine their potential applicability to the circumstances in this case.

**5.** As Poaipuni's counsel failed to seek to exclude Poaipuni's inculpatory statement as tainted fruit of the unlawful search, the supreme court did not hold that the trial court plainly erred in admitting the *Poaipuni* statement. 98 Hawai'i at 394, 49 P.3d at 360. The supreme court concluded, however, that Poaipuni's counsel provided him with ineffective assistance in failing to seek suppression of the confession. *Id.* at 395, 49 P.3d at 361.

and also placed the date and time in this section.

. . . .

Q: Detective Holokai, was there just one case that you were questioning the defendant about?

A: For my case, yes, it was a burglary case.

Q: Okay. And did that involve firearms or what?

A: The firearms case involved a separate case with another detective.

Q: Okay. Would that be Detective Fletcher?

A: Yes, it would.

Q: So during that night, would it be fair to say you and Detective Fletcher were questioning the defendant regarding more than one case that you were investigating or that the police were investigating?

A: Yes.

. . . .

Q [DEFENSE COUNSEL]: ... [I]n fact, there were three of you who were interested in interrogating [Defendant] and you were telling him basically that that was going to be the subject of this investigation, was not only your investigation, but also Detective Fletcher's and Detective Ching's; correct?

A: Yes, I informed [Defendant] of that. That's correct.

. . . .

Q: Now, when you said, are you willing to talk to me about this case that I'm going to talk to you about, did he already know what case you were talking about?

A: I'm not sure if he did know or not ...

. . . .

Q: *After you said, are you willing to talk to me about this case that I want to talk to you about, and after [Defendant] answered, okay, then you told him, if you are, that is, if you are willing to talk to me about this case, just sign, date and time [sic] on the form?*

A: *Yes, that's the procedure to have the person sign if they are willing to sign.*

Q: *And then you told him, Peter, I'm going to talk to you about the case in*

*Haiku that happened. That was your case; right?*

A: *That's my case, yes sir.*

Q: *This was a case where an ATM machine was taken from a grocery store in Haiku?*

A: *That's a burglary case, yes, sir.*

Q: *And then you said-well, in fact, you described it. A burglary at a Haiku General Store, but then you said later on Detective Ching has another case. Detective Ching has another case that he's working on at the Puunene Post Office. I think it's this morning on the 7th of July; right? You told him about that?*

A: *Told him Detective Ching wanted to talk to him about his case when I was through with my case.*

Q: *And then you said later on, also Detective Fletcher has a case that he's working on that occurred, I believe it was July 6th, but in this case, Detective Fletcher's case, there was an ATM machine pulled out from an establishment in Kihei, so he wanted to talk to you about that case. Okay. And [Defendant] said okay.*

A: Yes.

Q: Then you said, so you are willing to talk to us about these cases tonight, and he said yeah.

A: I believe so ...

. . . .

Q: Were you present when the subject then of asking [Defendant] about the guns first came up during this interview?

A: With Detective Fletcher?

Q: Yeah.

A: Yeah, I probably was present, yes.

Q: Okay. Did the guns that are the subject of this case have any connection with the case that Detective Fletcher was investigating?

A: The guns-Detective Fletcher's case was the burglary case in Kihei.

Q: That involved taking of an ATM machine; right?

A: Yes.

Q: This was an ATM machine that was taken and fell out the back of the truck

during the course of the culprits trying to get away?

A: Yes.

Q: No indication of any firearms being involved in that case; was there?

A: I don't believe so, no.

Q: In fact, was there any indication of a firearm being involved in the case that you were investigating, that is the Haiku Grocery Store burglary?

A: I did not get any indication from the complainant, no.

Q: To your knowledge the case that Mervin Ching [sic], likewise, did not involve firearms; did it?

A: I don't think so.

Q: Up until the point when Detective Fletcher asked [Defendant] about the guns that were found during a search of his house that night, had anybody advised him that he was going to be questioned about that subject?

A: I believe Detective Fletcher probably advised him of the weapons.

Q: When you say you believe he probably did, what does that mean? Does that mean that, yes, you're testifying under oath that he did, or you think he probably did?

A: Well, If I can follow the transcript I would know for certain, but this happened awhile back, so.

. . . .

Q: Could you look through that and tell me whether you see any indication of [Defendant] being advised of any investigation involving guns at his house prior to the time he was asked by Detective Fletcher about the guns?

A: There's a portion that Detective Fletcher had asked [Defendant] regarding the search at his residence in Pukalani, and Detective Fletcher mentioned something about locating some shotgun shells in one bedroom and that's what he talked to [Defendant] about.

Q: To your knowledge were those shotgun shells in any way connected with any of the three investigations that you were discussing with [Defendant] that night?

A: Regarding the burglary cases?

Q: Yeah.

A: No, it's not-it's not connected with those burglaries, no.

Q: Okay. And you said there was a place there where Detective Fletcher mentioned the shotgun shells found, and then he proceeds-it's just-that is the beginning of his interrogation when he asked [Defendant] about the firearms found in the tool shed?

A: Yeah, it looks like where Detective Fletcher started the interview with [Defendant] regarding the items that were found at the house.

Q: Up until that time that Detective Fletcher started the interview, there was no previous mention of the firearm; correct?

A: Correct.

*Id.* at 396–98, 49 P.3d at 362–64 (emphasis altered).

As Justice Acoba's concurring opinion points out, the officer had Poaipuni sign a waiver form and then informed him that other officers also wanted to speak with him about three other cases, to which Poaipuni agreed. *Id.* at 397, 49 P.3d at 363. Justice Acoba's concurring opinion stated:

As a result of the procedure followed, it appears that Defendant could not have known that he was to be asked about the firearms charge at the time he waived his rights. It is plain from the foregoing that, while Defendant was in custody: (1) three detectives interviewed him at the same time, about four different cases—the two burglaries, Detective Ching's case, and the instant case; (2) none of the three other cases involved firearms; (3) *at the time he was read the Miranda warnings and prior to questioning, Defendant was informed that he was going to be asked about the three other cases;* and (4) Defendant was never warned pursuant to *Miranda* that he was to be interrogated about the recovery of firearms from his home.

*Id.* at 398–99, 49 P.3d at 364–65 (emphasis added).

As made clear by Justice Acoba's discussion of *Spring, Ramones,* and *Nelson,* it was the officers' failure to advise Poaipuni that

the scope of the interrogation would include questioning on a firearms violation, as well as the three burglary and theft offenses—prior to questioning Poaipuni about the firearms—that constituted the constitutional infirmity. *Id.* at 399–401, 49 P.3d at 365–67.

The circumstances of the case before us are distinguishable from those in *Poaipuni.* Although the HPD–81 form signed by Strong only referenced a single incident, Strong was clearly advised that he was going to be questioned about the other three incidents *before* he was questioned about any of the incidents. Indeed, Officer Kiyotoki repeatedly reminded Strong that his constitutional rights were still available to him. At the end of the interview, Strong reiterated that he wanted to give a statement without a lawyer present and without remaining silent, that he gave the statement freely and voluntarily of his own free will, that no coercion, threat or force caused him to make the statement, and that he understood his constitutional rights. Thus, even if this court were to adopt the position of Justices Acoba and Levinson, *Poaipuni* would not answer the question presented in this case.[6]

■ Accordingly, we are obliged to consider, under the totality of the circumstances surrounding Strong's statement, whether the State met its burden of showing that Strong voluntarily, knowingly, and intelligently waived his Fifth Amendment and article 1, section 10, privilege as to the March 4, 2006 theft and the March 10 and 16, 2006 robber-

ies. *See, e.g., State v. Wallace,* 105 Hawai'i 131, 143, 94 P.3d 1275, 1287 (2004). Strong was clearly advised of his constitutional rights, both verbally and on the HPD–81 form on which they were listed. Strong signed and dated the form. As discussed above, Strong stated that he understood his rights both before and after he gave his statement to the police. The record reveals nothing about Strong's age, background or intelligence, or the conditions surrounding the interrogation, that suggest Strong was unable to understand or invoke his rights or that he was coerced or deceived into doing so.

■ Although Officer Kiyotoki's intentional strategy was to not list all of the potential criminal charges on the HPD–81 form, so as not to overwhelm Strong, the use of that strategy is not *per se* constitutionally impermissible so long as the *Miranda* warnings are contemporaneously given and knowingly, voluntarily, and intelligently waived. *See Ramones,* 69 Haw. at 406, 744 P.2d at 518. There is no precedent for the proposition that the police are required to provide a separate, written, *Miranda* warning for each specific crime addressed within a single interrogation, particularly when a defendant has been advised of the full scope of interrogation prior to the beginning of the questioning. Such an advisement has not been required under the United States Constitution. *Spring,* 479 U.S. at 576, 107 S.Ct. 851.[7] We

---

6. Obviously, if this court were to adopt the position of Justices Ramil and Nakayama, the *Miranda* warning given to Strong adequately advised him of his constitutional rights.

7. At least four other states have held that failing to inform a defendant of all the topics of interrogation does not affect a valid waiver of a defendant's *Miranda* rights. *Plumlee v. State,* 2000 WL 1258329 (Alaska App.) at *4 (expansion of questioning does not make *Miranda* waiver involuntary); *People v. Hicks,* 132 Ill.2d 488, 490, 139 Ill.Dec. 486, 548 N.E.2d 1042, 1046 (1989) (shifting topic of conversation to another crime after defendant's waiver of rights does not render confession involuntary); *Alston v. State,* 89 Md.App. 178, 184, 597 A.2d 1023, 1026 (1991) (officers need not give *Miranda* warning each time they question accused about a different subject within the same interrogation session); *Shell v. Commonwealth,* 11 Va.App. 247, 256, 397 S.E.2d 673, 678 (1990) (fact that defendant not informed he

would be questioned about his father's murder prior to waiving his constitutional rights did not negate otherwise valid waiver or confession); *see also, e.g., United States v. Rodriguez–Preciado,* 399 F.3d 1118, 1128 (9th Cir.2005) ("The Supreme Court has eschewed per se rules mandating that a suspect be re-advised of his rights in certain fixed situations in favor of a more flexible approach focusing on the totality of the circumstances.") (Referencing *Wyrick v. Fields,* 459 U.S. 42, 48–49, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982) (per curiam)); *United States v. Syslo,* 303 F.3d 860, 865–66 (8th Cir.2002) ("An officer may change the topic of interrogation without notice because a 'suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege.'" (citing *Spring,* 479 U.S. at 575, 107 S.Ct. 851)). This court cannot find any authority to support a

decline to expand the interpretation of the Hawai'i Constitution to mandate separate *Miranda* warnings under the circumstances of this case.

We conclude that Strong was adequately apprised of his *Miranda* rights and that he knowingly, voluntarily, and intelligently waived those rights.

## IV. *CONCLUSION*

For these reasons, the Circuit Court's April 7, 2008 Suppression Order is vacated and this matter is remanded for further proceedings.

requirement that police must provide *Miranda* warnings for each specific crime before questioning a suspect.